## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OHIO
### Akron Division

| | | |
|---|---|---|
| Drips Holdings, LLC, | ) | |
| | ) | |
| Petitioner, | ) | Misc. Action No. _____ |
| | ) | |
| v. | ) | |
| | ) | Arising from Civil Action No. 1:19-cv- |
| QUOTEWIZARD.COM, LLC, | ) | 12235-LTS, pending in the United |
| | ) | States District Court for the District of |
| Respondent. | ) | Massachusetts |
| | ) | |

## MEMORANDUM IN SUPPORT OF DRIPS HOLDING, LLC'S
## MOTION TO QUASH SUBPOENA TO PRODUCE DOCUMENTS

A federal court in Massachusetts has ordered the production of records from a party before it—QuoteWizard, LLC ("QuoteWizard")—that are simply not within its possession or control. *See Mantha v. QuoteWizard.Com, LLC*, 1:19-cv-12235-LTS (D. Mass.) (the "underlying action"). Instead, the records at issue are within the exclusive possession and control of Drips—a non-party company to the underlying action that is not subject to the jurisdiction of the Massachusetts Court.

Without hearing from Drips regarding the massive burden that the production would impose—and despite the fact that the plaintiff in that suit has made no effort to pursue the records from Drips—the Court in Massachusetts has, nonetheless, ordered QuoteWizard to produce certain records in Drips' possession. This, in turn, has lead QuoteWizard to demand an immediate production of the records by Drips—even though it has no contractual right to make such a demand—and then issue a Subpoena (attached hereto as Exhibit A) that does not take into account the unreasonable burden the demanded production would impose upon Drips.

As laid out in greater detail in the Declaration of Tom Martindale ("Drips Decl.") (attached as Exhibit B), the production demanded in the Subpoena would consume hundreds of hours and

cripple Drips—a small company with a technical team of only six employees—disrupting its business operations to the point that it could not assure steady and reliable access to a communications platform relied upon by its clients. It is not an overstatement to suggest that Drips' business operations and customer goodwill would be critically impacted—perhaps permanently— if it is forced to fully comply with the Subpoena. This is an outcome wholly at odds with the protections afforded to third parties under Rule 45.

The Court in Massachusetts did not hear from Drips regarding the burden the production would impose before ordering QuoteWizard to produce these records. Drips now respectfully turns to this Honorable Court for protection from the unduly burdensome Subpoena.

## BACKGROUND

As Drips understands it, the plaintiff in the underlying action seeks to represent two nationwide classes, claiming that QuoteWizard violated the do-not-call ("DNC") and automatic telephone dialing system restrictions of the Telephone Consumer Protection Act, 47 U.S.C. §§ 227 *et seq.* ("TCPA"). *Mantha* Am. Compl. [ECF No. 80]. QuoteWizard, contends that it had consent to send the messages at issue. *See, e.g.*, Mot. *Mantha* [ECF No. 17]. Drips was the platform used to send the texts at QuoteWizard's instruction, pursuant to QuoteWizard's representations that it had obtained needed consent before sending the messages.

The *Mantha* court bifurcated discovery into two phases, the first covering discovery regarding plaintiff's individual claim and the second covering class discovery. *See Mantha* Order [ECF No. 75] at 5. It is Drips' understanding that discovery has been limited to the plaintiff's individual claims, and that class discovery yet to commence. *See, e.g.*, *Mantha* Tr. [ECF No. 150-3] at 5:5-6 (plaintiff's counsel stating: "[W]e are proceeding individually as to Mr. Mantha. We haven't gotten to the class side yet.").

I.   **As Part of the Drips/QuoteWizard Relationship, Drips Provided Certain Records Related Consumer Interaction to QuoteWizard, But Drips Was Not Contractually Required to—and Did Not—Share the Actual Underlying Responses from Consumers with QuoteWizard.**

Drips operates an outreach platform that can be used by clients to contact their customers. Drips Decl. ¶ 8. QuoteWizard and Drips entered into an agreement whereby Drips would allow QuoteWizard to use its platform to deliver certain messages to consumers who opted in to receive those messages. *Id.*

As part of the relationship Drips would notify QuoteWizard in real time whenever a consumer responded in a manner that suggested they may not want future messages. *Id.* ¶ 9. Drips "tiered" those responses for QuoteWizard—indicating by an alphanumeric data element the degree of certainty Drips' algorithm had that the consumer wanted calls to cease. *Id.* For instance a clear statement of "do not call" would receive one tier score, whereas a less clear statement—such as "who is this?"—would receive a different tier score. *Id.*

QuoteWizard was free to do with the tiering as it saw fit, although Drips would simultaneously assure that consumers who clearly requested messages "stop" would receive no further messages. *Id.* ¶ 10. Drips would not, however, provide to QuoteWizard the actual underlying response from the consumer. *Id.* ¶ 11. These records have never been within the possession or control of QuoteWizard. *Id.*

II.   **Drips Stores its Archived Records Cold Storage that Is Not Designed for Queries and Reporting**

Drips maintains most business records—including the sort of consumer responses that are the subject of the Subpoena—for 60 days. *Id.* ¶ 12. After that the data is archived in "cold storage." *Id.* ¶ 13.

Although data within these cold storage warehouse resources is technically accessible, it is not well indexed and is stored chronologically without regard to client or campaign. *Id.* ¶ 14. As

explained in detail in the Drips Declaration, accessing the data and performing the search and extraction required to respond to the Subpoena is extremely burdensome.

### III.  The *Mantha* Plaintiff Initially Sought Records Directly from Drips but then Abandoned His Effort in the Face of Drips' Well-Founded Burden Objection.

The *Mantha* plaintiff served two separate subpoenas upon Drips for documents and one for testimony. *See* Ex. C, Troutman Decl. ¶ 3. In response to the document subpoenas, Drips prepared produced responsive records and asserted objections, explaining the burden that Drips would have to undertake to identify some of the requested records. *See id.* ¶¶ 3, 6.

Importantly, while plaintiff's requests arguably covered the third-party communications QuoteWizard has now been compelled to produce, plaintiff stood down on that demand following receipt of Drips' objection to the demand. Indeed, the plaintiff's second document subpoena requested Drips to "Produce all consumer do not call requests provided to you in any way relating to text telemarketing conducted on QuoteWizard's behalf. that [sic] are not communications with QuoteWizard directly." *See id.*, Ex. 2 (Oct. 16, 2020 Subpoena). In response, Drips asserted the following objections, explaining some of the burden Drips would have to undertake to identify these records:

> Once again, this demand category imposes a burden on non-party Drips far in excess of what is reasonable given the needs of this case and the fact that the information can be obtained from alternate sources and using alternate means. Plaintiff's counsel has failed to account for the need to protect Drips from undue burden in serving this demand. To the extent the "do not call requests" came from class member they fall outside the scope of permissible discovery in the case. To the extent the "do not call requests" came from non class members they are classically unrelated to the subject matter of this case—and this is especially so since the information sought was never communicated to Defendant and could not, therefore, bear on issues such as willfulness.

> Moreover, even if the do not call requests themselves had some limited pertinence to the case—for instance allowing identification of class members at a later stage in the litigation—these requests could be more readily obtained from Defendant, a party in this matter, and it is Drips' understanding that Defendant has in fact produced the do not call requests to Plaintiff. Requiring Drips to respond to this demand would be make-work, and would require Drips, a non-party, to spend unnecessary time and potentially hundreds

of hours in order to to: i) identify all DNCs regarding Defendant (a burdensome task in and of itself); and ii) review each to determine whether it was communicated to Defendant (requiring a request by request review and comparison with Defendant's request list). Given that Plaintiff already has a copy of the DNC request it seeks, and because these records seemingly have no relevance at this stage of the case, the burden associated with this production is plainly vastly out of step with the proportionality analysis required under Rule 26.

Drips also objects to this request to the extent it seeks confidential, proprietary, and trade secret information that may jeopardize Drips' competitive advantage. Requiting the production of such materials from a non-party is particularly inappropriate and disproportionate to the needs of the case given that, as noted above, Plaintiff has received the actual do not call requests from QuoteWizard as a party to the litigation, and because it seeks information relating to calls and texts that are not currently at issue.

Additionally, Drips further objects to this request on the ground that it improperly seeks confidential information concerning other consumers. And, to the extent this demand seeks records containing do not call requests stemming from messages or calls Drips may have on behalf of its other clients, this demand is plainly overly broad and seeks information outside of the scope of discovery and in a manner that is unduly burdensome and disproportionate to the needs of the case.

. . .

On the basis of these objections no responsive records will be produced, and Drips requests that Plaintiff withdraw this request to avoid burdening a non-party when Defendant has already produced the records Plaintiff seeks.

*Id.*, Ex. 3 (Objection to Request No. 9).

Drips served these objections in November 2020, and, tellingly, the *Mantha* plaintiff did not follow up on the subject nor move to compel. *See id.* ¶ 7. Drips also designated a corporate representative to testify at a December 17, 2020 deposition. *See id.* ¶¶ 3(e)-(f), 8. Following this deposition, Drips received no follow ups from either party regarding the records QuoteWizard now seeks. *Id.* ¶ 8. Thus, Drips presumed the issue was resolved. *Id.*

## IV. Rather Than Seek to Compel Production from Drips—the Party in Possession of the Records—the *Mantha* Plaintiff Accomplishes an End-Run Around Rule 45—Moving to Compel QuoteWizard to Produce Records it Does Not Have.

In the face of Drips' meritorious objections, the *Mantha* Plaintiff changed its target and elected to pursue production of the subject records directly from QuoteWizard. The problem, of course, is that QuoteWizard did not possess or control such records.

As Drips understands matters, QuoteWizard has already produced the substantial records that *are* within its possession or control—including all records of DNCs QuoteWizard received from Drips (a list of approximately 46,000 numbers)—and the corresponding "tier" for each DNC request.[1] *See Mantha* Order [ECF 112]; *see also* QuoteWizard Objections [ECF 133] at 2-3. While this plainly seems sufficient for Plaintiff to prove his case—more on that below—Plaintiff was not satisfied. Rather he demanded QuoteWizard produce what it never possessed—the underlying responses from consumers that Drips never gave it.

Moved by Plaintiff's arguments—and finding that QuoteWizard (but not Drips) may have waived certain objections[2]—on January 11, 2021, the Magistrate Judge assigned to the *Mantha* case ordered QuoteWizard to produce "all comments' by consumers related to the 46,000 Do Not Call requests, whether pertaining to 'complaints about the texts received or simply 'opt-outs, made' by consumers who received telemarking texts from QuoteWizard (including those made on behalf of QuoteWizard by Drips)." *Mantha* Order [ECF 132].

At that time QuoteWizard's counsel reached out to Drips requesting that it produce the records. In light of the large burden associated with the response, and the fact that no contractual terms contemplated such a production, Drips declined via written e-mail on January 23, 2021. *See*

---

[1] Pertinently, Drips tiers responses it receives in real time and shares that information with its clients to allow its client to properly stop calls and texts to consumes who may not want to receive further communication. Drips Decl. ¶ 9.

[2] The district court's ruling in particular implied that *QuoteWizard* might had waived certain objections, explaining the unusual procedural posture here. Specifically, the court stated that [o]ne might reasonably conclude that" the October 2020 Order—which "required *QuoteWizard* to 'produce all 'Do Not Call' requests relating to telemarketing conducted on behalf of QuoteWizard by Drips"—"required production of the DNC requests received by Drips on QuoteWizard's behalf and that any ambiguity or objection ought have been timely raised in response to that unchallenged Order." *Mantha* Order [ECF No. 144] (emphasis added). Notably, it is clear that *Drips* was not found to have waived any objections—and it has not.

*Mantha* [ECF No. 133-3]; *see also* Troutman Decl. ¶ 9. On February 24, 2021 the District Judge affirmed the Magistrate's order. *See* Order [ECF 144].

Facing an Order compelling QuoteWizard to produce documents, QuoteWizard now propounds a subpoena that expressly demands Drips to produce those documents to QuoteWizard so that QuoteWizard can produce them to Plaintiff. Specifically, the Subpoena demands that Drips produce the following:

> All comments made by consumers to Drips related to all Do Not Call requests (as classified by Drips) made by consumers who received telemarking texts from Drips on behalf of QuoteWizard. For further reference, please see the Orders of the U.S. District Court for the District of Massachusetts ordering production of these records in Drip's possession from QuoteWizard, dated January 11, 2021 (ECF No. 132) and February 24, 2021 (ECF No. 144). . . . .

Ex. A, Subpoena. Drips now timely seeks the protection of this Court and moves against this unduly burdensome and improper Subpoena.

## LEGAL STANDARD

Federal Rule of Civil Procedure 45(d)(3) states that "[o]n timely motion, the court for the district where compliance is required **must** quash or modify a subpoena that: . . . subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(iii) (emphasis added). Additionally, under Rule 45, "[n]on-parties have a right to have their objections, if any, heard by the court before being required to produce documents." *Paliwoda v. Showman*, No. 12-2740-KGS, 2013 U.S. Dist. LEXIS 98011, at *12 (D. Kan. July 15, 2013).

The scope of a subpoena issued under Rule 45 of the Federal Rules of Civil Procedure is "subject to the general relevancy standard applicable to discovery under Fed.R.Civ.P. 26(b)(1)." *Cawley v. Eastman Outdoors, Inc.*, No. 1:14-CV-00310, 2014 U.S. Dist. LEXIS 130588, at *4 (N.D. Ohio Sep. 16, 2014). Rule 45 specifies that where electronically stored information is "not

- 7 -

reasonably accessible because of undue burden or cost," that information can only be produced "if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C)." Fed. R. Civ. P. 45(e)(1)(D). Under Rule 26(b)(2)(C), courts "*must* limit" discovery if, among other things, "the proposed discovery is outside the scope permitted by Rule 26(b)(1)." The scope of discovery is limited under Rule 26(b)(1) to nonprivileged materials that are "relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

When considering whether to quash a subpoena, "[t]he court may also consider 'whether (i) the subpoena was issued primarily for the purposes of harassment, (ii) there are other viable means to obtain the same evidence, and (iii) to what extent the information sought is relevant, nonprivileged, and crucial to the moving party's case.'" *Malibu Media, LLC v. John Doe Subscriber Assigned IP Address 76.190.140.193*, No. 1:15 CV 1342, 2015 U.S. Dist. LEXIS 150388, at *2 (N.D. Ohio Nov. 5, 2015) (quoting *Recycled Paper Greetings, Inc. v. Davis,* No. 1:08-MC-13, 2008 U.S. Dist. LEXIS 10649, at *7 (N.D. Ohio Feb. 13, 2008)) (citing cases); *see also Stoneeagle Servs. v. Pay-Plus Sols., Inc.*, No. 1:15-MC-00010, 2015 U.S. Dist. LEXIS 28572, at *4 (N.D. Ohio Mar. 9, 2015).

## ARGUMENT

Drips seeks the protections of this Court against the undue burden the Subpoena would impose. This Motion is "timely" because it is made before the time for compliance in the Subpoena. Fed. R. Civ. P. 45(d)(3)(A). And Drips, headquartered in Akron, Ohio, seeks relief from this this Court as the "district where compliance is required." Fed. R. Civ. P. 45(d)(3).

- 8 -

This Subpoena must be quashed to protect Drips from the extreme undue burden that compliance would require. The Subpoena should also be quashed because there is no good cause for the records given their meager relevance to the underlying dispute, which the burden on Drips heavily outweighs.

## I.   The Subpoena Must Be Quashed to Protect Drips from the Extreme Burden that Compliance Would Require.

Rule 45 requires courts to quash or modify a subpoena where—like here—it "subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(iii). "Undue burden is to be assessed in a case-specific manner considering such factors as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed." *In re: Modern Plastics Corp.*, 890 F.3d 244, 251 (6th Cir. 2018) (internal quotation marks and citation omitted). "Courts must 'balance the need for discovery against the burden imposed on the person ordered to produce documents,' and the status of that person as a non-party is a factor." *Id.*

Under this standard, courts in the Sixth Circuit quash subpoenas that involve significantly less burden than Drips would undergo here. The Sixth Circuit, for example, affirmed the decision to quash a subpoena as unduly burdensome where "[c]ompliance with the subpoena would require the expert who has no direct connection with the litigation to spend many days testifying and disclosing all of the raw data, including thousands of documents, accumulated over the course of a long and detailed research study." *Buchanan v. American Motors Corp.*, 697 F.2d 151, 152 (6th Cir. 1983). In a case in the Southern District of Ohio, the court granted a motion to quash as overly burdensome based on an affidavit of corporate compliance officer stating that it would take 1,000 hours of employee time to prepare the documents requested in the subpoena. *See In re CareSource Mgmt. Group Co.*, 289 F.R.D. 251, 253 (S.D. Ohio Jan. 3, 2013).

Cases across the country have come to similar conclusions. In one case, for example, *t*he court found undue burden where compliance would require the requested party to spend thousands of dollars in employee wages and the expense of hiring an outdoor vendor to search its computer network. *City of Whiting v. Whitney, Bailey, Cox & Magnani, LLC*, No. 2:14-CV-440-JTM-PRC, 2017 U.S. Dist. LEXIS 80026, at *3-4 (N.D. Ind. May 25, 2017) ("[T]he burden of time and expense placed on Superior by the subpoena is undue in light of Superior's status as a non-party to this lawsuit and that given the likelihood of many of the requested documents already being in Whiting's possession, the requests are not proportional to the needs of the case."); *see also, e.g.*, *Allen v. Howmedica Leibinger, GmhH*, 190 F.R.D. 518, 525 (W.D. Tenn. 1999) (granting a non-party's motion to quash a subpoena where the non-party established that he would face a substantial burden if required to comply with discovery requests where the non-party submitted an unrebutted affidavit explaining the time and effort—review of nearly 70,000 documents and nearly a month of man-hours—compliance would require); *Thomas v. IEM, Inc.*, No. 06-886-B-M2, 2008 U.S. Dist. LEXIS 19186, at *9 n.6 (M.D. La. March 12, 2008) (denying motion to compel overly broad and unduly burdensome subpoena where the party gave a "specific estimate of the staff hours, and associated monetary cost, that would be expended in order to comply," amounting to 700 hours of staff time and over $120,000 in costs).

As these cases demonstrate, the burden imposed upon Drips is "undue" and warrants the Court's protections. Here, complying with the subpoena would take over 500 hours of developer/administrator time and over 700 hours of processing time. *See* Drips Decl. ¶ 38. For some large institutions that burden might be absorbable, but for Drips—a company with only six technical employees—it would be disastrous. *See* Drips. Decl. ¶ 39. Of course, in the event that Drips is ordered to produced, the costs should be shifted to one or both of the parties in the

underlying matter, and any production would have to be designated as confidential and subject to the terms of an appropriate protective order. However, for Drips, that would not ameliorate the severe burden and consequences. These employees are fully engaged on mission-critical tasks and assignments, and Drips simply does not have the capacity to divert hundreds of their hours to respond to this Subpoena without jeopardizing Drips' business. *See id.* Doing so would mean that Drips would not have the manpower necessary to maintain its contractual obligations to its client base and assure a steady and reliable communications platform to the numerous companies that rely on it. *Id.* This would severely disrupt business, to the point where it could cause the company to lose clients and, in a worst-case scenario, would result in the company having to shut down completely. *Id.* Drips requests that this Court grant this Motion to protect Drips from this undue burden.

**II.    The Subpoena Should also Be Quashed Because There is No Good Cause for the Requested Record as the Burden Imposed on Drips is Disproportionate to and Substantially Outweighs any Tangential Relevance to the Underlying Case.**

The Subpoena exceeds the permissible scope of discovery, which provides an additional ground to quash. "The scope of discovery under a subpoena is the same as the scope of discovery under Rule 26." *Hendricks v. Total Quality Logistics*, 275 F.R.D. 251, 253 (S.D. Ohio 2011). "To fall within that scope, the materials sought at a minimum must be 'nonprivileged' and 'relevant to any party's claim or defense and proportional to the needs of the case'" *Marquinez v. Dole Food Co.*, No. 1:20-mc-042, 2021 U.S. Dist. LEXIS 6286, at *15 (S.D. Ohio Jan. 13, 2021) (quoting Fed. R. Civ. P. 26(b)(1)).

Although the scope is the same, proportionality concerns weigh more heavily when considering nonparty discovery (i.e., a party seeking discovery from a nonparty must make a greater showing of relevance). *See, e.g.*, *id.* at *19 ("The 'proportionality' concerns for discovery of questionable relevance from a party differs from that which can be obtained from a non-party,

for good reason."). In one case, for example, the Southern District of Ohio distinguished the court's order from the underlying action, which had overruled *the defendant's* objections, finding that the "prior orders are easily reconciled with the view of this Court that the subpoena directed to [*non-party*] P&G is not appropriately proportional to the claims at issue, based upon P&G's non-party status and the tangential and extremely limited relevance of the discovery sought from P&G to any of Plaintiffs' existing claims against either Defendant as compared to the burden forced upon P&G to prepare its corporate representative(s) to address such broad topics." *Stiles v. Walmart Inc.*, No. 1:20-mc-002, 2020 U.S. Dist. LEXIS 72475, at *20-21 (S.D. Ohio Apr. 24, 2020).

A lack of proportionality, therefore, provides an additional basis to quash. *See, e.g.*, *id.*; *Marquinez*, 2021 U.S. Dist. LEXIS 6286, at *19 ("Here, proportionality considerations alone would preclude such a blatant fishing expedition. In other words, given the remote likelihood of relevance of the discovery sought and The Enquirer's non-party status, the subpoena directed to The Enquirer is not appropriately proportional to the claims at issue."); *Whiting*, 2017 U.S. Dist. LEXIS 80026, at *4 quashing a subpoena in part because "the requests are not proportional to the needs of the case" and thus the "requests [were] outside the scope of discovery" under Rule 26(b)).

In this case, the tangential and limited relevance of the demanded records militates heavily against a finding of proportionality. While Drips does not quibble with the Massachusetts Court's determination that the demanded records have *some* marginal relevance to the underlying suit—and Drips does not ask this court to collaterally revisit that determination—from a proportionality perspective it is important to keep in mind that these records are not central to Plaintiff's case. Rather these records—essentially constituting potential complaints about QuoteWizard's conduct—are pertinent solely to whether enhanced damages might be awarded, and potentially vicarious liability.

Backing up, the TCPA is, for all purposes relevant here, a strict liability statute. *See, e.g.*, *Currier v. PDL Recovery Grp.*, LLC, 2017 U.S. Dist. LEXIS 25240, at *26 (E.D. Mich. Feb. 23, 2017) ("The TCPA is essentially a strict liability statute which imposes liability for erroneous unsolicited [calls]." (alteration in original) (citation omitted)). Either QuoteWizard sent messages using regulated technology without consent, or it did not. The content of consumer reaction to the messages—although pertinent to willfulness, which will be discussed below—is not dispositive (or really even pertinent) to the critical issues in the case. That is because QuoteWizard has the burden of proving consent[3]—either it can meet that burden or it cannot. And just because a consumer responds positively or negatively to a message does not mean it was legal or illegal.

It is true, perhaps, that a fact finder might consider a highly negative reaction from consumers when assessing the reliability of QuoteWizard's consent records. Perhaps a high prevalence of "do not call" requests might mean that QuoteWizard's records were not accurate. And perhaps potentially nasty messages from a consumer might be further attuned evidence on point. While Drips disagrees that such messages might prove the underpinning of an inference that otherwise admissible business records of consent are somehow unreliable,[4] it really does not matter here since QuoteWizard has already produced records demonstrating both: i) the number of do not call requests received on the campaigns at issue; and ii) the "tier score" i.e., the severity of the "do not call requests."

---

[3] *See, e.g.*, *Rodriguez v. Premier Bankcard, LLC*, No. 3:16CV2541, 2018 U.S. Dist. LEXIS 149225, at *8, *15 (N.D. Ohio Aug. 31, 2018) ("'[e]xpress consent' . . . 'is not an element of a plaintiff's prima facie case but is an affirmative defense for which the defendant bears the burden of proof.").

[4] *See In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 F.C.C. Rcd. 7961, 7996-97, ¶¶ 64, 67 (July 10, 2015) (noting "[t]he well-established evidentiary value of business records means that callers have reasonable ways to carry their burden of proving consent.").

That is, even assuming that consumer responses to QuoteWizard's outreach campaign was pertinent on the issue of consent—again, the only central liability issue that the records might pertain to—Plaintiff already has the evidence it needs to rebut QuoteWizard's factual showing. Plaintiff knows precisely how many people requested calls to stop, and precisely what percentage of those individuals did so in an "enhanced" manner potentially suggestive of a lack of consent. Presenting the actual underlying record from the consumer might be gratifying to the Plaintiff and his counsel—and again, strictly speaking the content of that record might be pertinent at trial so Plaintiff can "show and not merely tell" the jury about the consumer's response to the campaign— at this stage the underlying messages are of no greater value on the issue of consent that the aggregate response data that is already in Plaintiff's possession.

Plaintiff in the underlying suit also made much of the pertinence of the records on the issue of willfulness. Here again, Drips does not take issue with that position conceptually—if QuoteWizard is deemed to have been aware of a high number of DNC requests perhaps its conduct can be viewed as more willful than if it has not been. Yet again, the court—which will be the ultimate determiner on the issue of enhanced damages—is already armed with data as to the precise number of DNC's QuoteWizard was aware of and their severity tier. The fact that QuoteWizard never requested Drips to produce the underlying records as part of its ordinary business practice may make these facts more or less blameworthy in the Massachusetts Court's view, but the content of the underlying records—having never been actually seen by QuoteWizard—cannot itself shift the scale toward willfulness.

Next, even if the records are pertinent on the issue of willfulness, that is a secondary determination pertinent solely on the issue of whether enhanced damages will be permitted. The TCPA affords fixed statutory damages of $500.00 per call and affords the Court *discretion* to treble

- 14 -

in the event willfulness can be found. *See* 47 U.S.C. § 227(b)(3). Even assuming *arguendo*, therefore, that the content of each consumer response to QuoteWizard's campaign were relevant to the willfulness determination that would only be so *after* a trial on the merits.

At that point (i.e., after trial), and in full view of the proceedings that had just played out before it, the Massachusetts court might yet determine that it wants to see the underlying records and upon a sound non-speculative basis of need for the same. At this stage, however, the need for the records is contingent upon Plaintiff prevailing on a trial that is many months and perhaps years away—assuming the case is not resolved by the parties in the meantime.

Obviously requiring Drips to undertake the massively burdensome production effort described above at a stage in the proceeding when the records are not yet pertinent, and may never be, is disproportionate to the needs of the case at this stage and antithetical to the purposes of Rule 26 and 45's limits on discovery to third-parties.[5] The Subpoena should thus be quashed.

## CONCLUSION

For the foregoing reasons, and in the interest of justice, Drips respectfully requests that the Court grant its Motion and quash the overly burdensome Subpoena.

Date: March 12, 2021

SQUIRE PATTON BOGGS (US) LLP

/s/*Jesse L. Taylor*
Jesse L. Taylor (0088209)
jesse.taylor@squirepb.com
SQUIRE PATTON BOGGS (US) LLP
41 South High Street
Columbus, OH 43215
(614) 365-2700 (Phone)
(614) 365-2499 (Fax)

---

[5] It should also be noted that the *Mantha* court actually affirmatively bifurcated discovery before ordering production of the subject records. *See Mantha* Order [ECF No. 75] at 5. While that court is the master of its own docket, respectfully, there seems to be a plain disconnect between bifurcating class and individual discovery, on the one hand, and compelling production of records (such as complaints lodged by absent class members) that are aimed at the merits of class member claims.

Eric J. Troutman (*pro hac vice* forthcoming)
eric.troutman@squirepb.com
Squire Patton Boggs (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, CA 90071
(213) 689-6510 (Phone)
(213) 623-4581 (Fax)

*Counsel for Drips Holdings, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on March 12, 2021, a copy of the foregoing was served via email to the following counsel of record in the underling matter:

Matthew P. McCue
THE LAW OFFICE OF MATTHEW P. MCCUE
1 South Avenue, Suite 3
Natick, MA 01760
Telephone: (508) 655-1415
mmccue@massattorneys.net

Edward A. Broderick
BRODERICK LAW, P.C.
176 Federal Street, Fifth Floor
Boston, MA 02110
Telephone: (617) 738-7080
ted@broderick-law.com

Anthony I. Paronich
PARONICH LAW, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
(508) 221-1510
anthony@paronichlaw.com

Alex M. Washkowitz
Jeremy Cohen
CW LAW GROUP, P.C.
188 Oaks Road Framingham, MA 01701
alex@cwlawgrouppc.com

*Counsel for Plaintiff Joseph Mantha*

Kevin P. Polansky
kevin.polansky@nelsonmullins.com
Christine M. Kingston
christine.kingston@nelsonmullins.com
NELSON MULLINS RILEY & SCARBOROUGH LLP
One Financial Center, Suite 3500
Boston, MA 02111
(t) (617)-217-4700
(f) (617) 217-4710

*Counsel for Defendant QuoteWizard, LLC*

/s/*Jesse L. Taylor*